UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

ROBERT BELL,

        Plaintiff,

    -v-

THE CITY OF NEW YORK, New York City Police
Department Officer PETER PLAY (Shield No. 21378),
Officers JOHN DOE 1 through JOHN DOE 3 (the name
"John Doe" being fictitious, as the true names and shield
numbers are not presently known), in their individual
capacities,

        Defendants.

------------------------------------------------------------------x

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**

<u>**12-CV-5357 (PAC)**</u>

    "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1997).

    "Since 1886, the middle finger has evolved into perhaps the most commonly used insulting gesture in the United States." Robbins, I., *Digitus Impudicus: The Middle Finger and the Law*, 21 U.C. Davis L. Rev. 1403, 1415 (2008).

    "These days, 'the bird' is flying everywhere." *Coggin v. Texas*, 123 S.W.3d 82, 90 n.3 (Tex. App. 2003) (citation omitted).

   Plaintiff ROBERT BELL, through his attorney ROBERT M. QUACKENBUSH of Rankin & Taylor, PLLC, as and for his complaint, does hereby state and allege:

<u>**PRELIMINARY STATEMENT**</u>

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States, through the Civil

Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, and pendant claims through the Constitution and laws of the State of New York.

2.  Plaintiff ROBERT BELL's rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis arrested him and caused him to be maliciously prosecuted.

3.  Specifically, when Mr. BELL saw three police officers pass by him on the street, he expressed his dislike and distrust for police officers by raising his middle finger towards them, while their backs were turned to him and while there were no more than two or three other civilians on the street or sidewalk.

4.  Nevertheless, despite the fact that none of these three officers saw Mr. BELL raise his middle finger towards them, and despite the complete absence of reaction from any civilians, and in apparent retaliation for this obviously protected form of speech, a fourth officer who observed the expressive gesture arrested Mr. BELL and caused him to be prosecuted for disorderly conduct.

5.  Despite making the retaliatory arrest on the street, the arresting officer declined to show up to criminal court to defend his choice to arrest Mr. BELL, resulting in the dismissal of the charge.

6.  By reason of defendants' actions, including their unreasonable and unlawful searches and seizures, Mr. BELL was deprived of his constitutional rights.

7.  Mr. BELL also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

9. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that Mr. BELL's claim arose in the Southern District of New York.

10. Pursuant to New York General Municipal Law § 50-E, Mr. BELL filed a timely Notice of Claim with the New York City Comptroller on or about November 5, 2010, within ninety (90) days of the events herein complained of. Thus, this Court has supplemental jurisdiction over Mr. BELL's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

11. Mr. BELL's claims have not been adjusted by the New York City Comptroller's Office.

12. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

13. Plaintiff ROBERT BELL is, and was at all times relevant to this action, a resident of the County of Middlesex in the State of New Jersey.

14. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

15. NYPD Officer PETER PLAY (Shield No. 21378) and NYPD Officers JOHN DOE 1 through JOHN DOE 3 (referred to collectively as the "officer-defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

16. The true names and shield numbers of defendant-officers DOE 1 through DOE 3 are not currently known to Mr. BELL. However, all of the "Doe" defendants are employees or agents of the NYPD. Accordingly, they are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York General Municipal Law § 50-K. The Law Department, then, is hereby put on notice (a) that Mr. BELL intends to name the "Doe" defendants as defendants in an amended pleading once their true names and shield numbers become known and (b) that the Law Department should immediately begin preparing their defense in this action.

17. The officer-defendants are being sued in their individual capacities.

18. At all times relevant herein, the officer-defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.  They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

19. The officer-defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Mr. BELL's rights.

20. At all relevant times, the officer-defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

21. The events described herein occurred primarily on August 6, 2011 at approximately 10:00 p.m. in front of The Slaughtered Lamb Pub located at 182 West 4th Street in the County and State of New York.

22. At approximately the time and place mentioned above, Mr. BELL stepped out of The Slaughtered Lamb Pub in order to get some air.

23. At the time Mr. BELL exited the building, approximately two or three other civilians were in his vicinity.

24. As Mr. BELL was standing outside the building, he noticed three of the officer-defendants, who were in uniform and apparently on foot patrol, walk past him from his left to his right.

25. The officer-defendants continued walking away from Mr. BELL, with their backs to him.

26. When the officer-defendants were about ten feet from Mr. BELL, and while all of their backs were still turned to him, Mr. BELL lifted his middle finger and pointed it towards the officer-defendants.

27. Mr. BELL's finger remained in the air for approximately one to two seconds.

28. Upon information and belief, since all three of the officer-defendants' backs were turned to Mr. BELL at the time he made the gesture, none of the three officer-defendants at issue saw Mr. BELL make the gesture.

29. While it is unknown whether any of the two or three other civilians on the street saw Mr. BELL make the gesture, not a single civilian appeared to take notice of Mr. BELL or his middle finger.

30. Nevertheless, a fourth officer-defendant (referred to herein as the "arresting officer"),[1] who was lagging far behind the other officers and who was standing to Mr. BELL's left and out of his view, apparently saw Mr. BELL make the gesture to the other three officer-defendants' backs.

31. The arresting officer approached Mr. BELL and asked, "DO YOU THINK THAT'S FUNNY?"

32. Before Mr. BELL could respond to the question, the arresting officer grabbed Mr. BELL, rear-cuffed him, escorted him around the corner near the other officer-defendants, and pushed Mr. BELL chest-first into a wall.

33. The arresting officer and at least one other officer-defendant then began searching through Mr. BELL's pockets and searching him for weapons or contraband.

34. One of the officer-defendants asked Mr. BELL, in sum and substance, "WHY'D YOU DO THAT?" In so doing, the officers failed to inform Mr. LEWIS of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny.

35. In response, Mr. BELL truthfully replied, "Because I don't like cops."

36. The officer-defendants then placed Mr. BELL in the back of a police vehicle.

37. As a result of the officer-defendants' conduct, a crowd of onlookers began to develop.

38. While Mr. BELL was in the back of the vehicle, defendant P.O. PLAY got into the vehicle and again asked why Mr. BELL made the gesture at the officers.

39. In response, Mr. BELL again said he made the gesture because of his dislike of the police.

---

[1] The arresting officer can roughly be described as a short, stocky white male with blond hair.

40. The officer-defendants then transported Mr. BELL to the NYPD's Sixth Precinct located at 233 West 10th Street in the County of New York.

41. There, the officer-defendants put Mr. BELL in a holding cell.

42. While in the cell, several officer-defendants made derogatory comments and taunts regarding their perception of Mr. BELL's sexual orientation.

43. About one to two hours later, Mr. BELL was issued a criminal court summons and released from custody.

44. The criminal court summons charged Mr. BELL with violating New York Penal Law § 240.20(3), disorderly conduct by making an "obscene gesture."

45. The charge was based upon allegations sworn to by defendant P.O. PLAY, wherein he alleged as follows:

> At time and place of occurrence, the undersigned did observe the respondent making obscene gesture on a public sidewalk in front of a large crowd creating public alarm and annoyance. Respondent did give police officers middle finger when they passed by and stated "I hate to (*sic*) police."

46. The bulk of P.O. PLAY's allegations are complete fabrications.

   a. *First*, at the time Mr. BELL made the gesture, there were only two or three civilians in the immediate vicinity. There was not a "large crowd."

   b. *Second*, even if any of the two or three civilians on the street saw Mr. BELL's gesture, not a single civilian reacted with any "alarm or annoyance."

   c. *Third*, Mr. BELL did not vocalize dislike of the police until *after* he was already in custody.

   d. *Fourth*, and notwithstanding, Mr. BELL never stated that he "hated" the police. On the contrary, he told the officers that he does not "like" police officers.

47. Nevertheless, pursuant to a municipal custom and practice of encouraging officers to make false statements in judicial proceedings and failing to discipline officers when they engage in

perjury (as set forth more fully *infra*), defendant P.O. PLAY felt empowered to make false statements without fear of discipline or other reprisals from defendant CITY.

48. The criminal court summons ordered Mr. BELL to appear in criminal court on October 18, 2011 to answer the disorderly conduct charge.

49. Mr. BELL, along with counsel from the New York Civil Liberties Union, appeared in criminal court on October 18, 2011. There, Mr. BELL pled not guilty and requested a trial date.

50. At the second criminal court appearance, defendant P.O. PLAY declined to appear to testify against Mr. BELL.

51. Accordingly, the charge against Mr. BELL was dismissed in its entirety due to the facial insufficiency of the summons and the government's failure to prosecute.

52. As a result of defendants' conduct, Mr. BELL legitimately fears he will be unable to gain admission to the law school(s) of his choice since his preferred schools require the applicant to disclose the facts underlying any arrest, regardless of whether the arrest-related records were sealed upon dismissal of the criminal case or not.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

53. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

54. Defendants, under color of state law, subjected Mr. BELL to the foregoing acts and omissions, thereby depriving Mr. BELL of his rights, privileges and immunities secured by the United States Constitution, including, without limitation, deprivation of the following federal constitutional rights guaranteed through 42 U.S.C. § 1983: (a) freedom from

8

retaliatory arrest, under the First and Fourteenth Amendments, (b) freedom from retaliatory prosecution, under the First and Fourteenth Amendments, (c) freedom from unreasonable seizure of his person, under the Fourth and Fourteenth Amendments, (d) freedom from false arrest and false imprisonment, under the Fourth and Fourteenth Amendments; (e) freedom from malicious prosecution, under the Fourth and Fourteenth Amendments; (f) freedom from having *Miranda*-defective statements used against him in a criminal court proceeding, under the Fifth and Fourteenth Amendments; (g) freedom from the lodging of false charges against him by police officers in violation of his rights to due process, under the Fifth and Fourteenth Amendments; (h) freedom from having police officers fabricate evidence against him in violation of his rights to due process, under the Fifth and Fourteenth Amendments; and (i) freedom from abuse of process in violation of his rights to due process, under the Fifth and Fourteenth Amendments.

55. Defendants' deprivation of Mr. BELL's constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**<ins>FAILURE TO INTERVENE IN CONSTITUTIONAL VIOLATIONS  – 42 U.S.C. § 1983</ins>**

56. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

57. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency violate a civilian's constitutional rights.

58. The officer-defendants were present for the above-described incident and witnessed the arresting officer unlawfully arrest Mr. BELL and thereby interfere with activity protected by the First Amendment.

59. Both the arrest of Mr. BELL and the initiation of criminal process against him were clearly without probable cause or other legal justification, and were based on facts alleged by OFFICER PLAY which the "Doe" defendants knew to be false, yet the "Doe" defendants failed to take any action or make any effort to intervene, halt or protect Mr. BELL from being unlawfully and wrongfully arrested and prosecuted.

60. The officer-defendants' violations of Mr. BELL's constitutional rights by failing to intervene in the conduct alleged herein resulted in the injuries and damages set forth above.

**THIRD CLAIM**
**_MONELL_ CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983**

61. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

62. All of the acts and omissions by the named and unnamed officer-defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

63. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the officer-defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

64. The acts complained of were carried out by the aforementioned officer-defendants in their capacities as police officers pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

65. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a. Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas), particularly where such persons are engaged in activity protected by the First Amendment;

   b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i.  in order to protect other officers; and/or

        ii. in order to meet said productivity goals;

   c. Failing to adequately supervise, train, instruct and discipline police officers and encouraging their misconduct;

   d. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

   e. Retaliating against officers who report police misconduct; and

   f. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

66. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous criminal prosecutions of police officers:

   a. People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on

to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

b. <u>Schoolcraft v. City of New York</u>, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

c. <u>Long v. City of New York</u>, 09-CV-6099 (AKH) (S.D.N.Y.); <u>People v. Pogan</u>, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and is convicted of falsifying police records; Mr. BELL was engaged in expressive conduct, <u>to wit</u>, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

d. <u>Taylor-Mickens v. City of New York</u>, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

e. <u>Lin v. City of New York</u>, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square, activity which is protected by the First Amendment, and swear out a criminal complaint whose facts are contradicted by video evidence);[2]

f. <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude

---

[2]      For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

g. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated Mr. BELL's constitutional rights and contributed to her arrest);[3]

h. <u>Callaghan v. City of New York</u>, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, <u>to wit</u>, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[4]

i. <u>Carmody v. City of New York</u>, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

j. <u>MacNamara v. City of New York</u>, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

k. <u>Powers v. City of New York</u>, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

l. <u>Kunstler v. City of New York</u>, 04-CV-1145 (RWS) (MHD) (S.D.N.Y.) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to Mr. BELLs' political beliefs);

m. <u>Allen v. City of New York</u>, 03-CV-2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum; numerous police officers falsely swear that they gave orders to disperse; and, even if they had given such orders, the police provided no place of egress for the protestors to disperse);

n. <u>Barry v. New York City Police Department</u>, 01-CV-10627 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory

---

[3]     For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_ quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[4]     For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/ 19critical.html?_r=1.

demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

o. Walton v. Safir, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

p. White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

q. Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

r. Sorlucco v. New York City Police Department, 89-CV-7225 (CCH), 888 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her); and

s. Kaufman v. City of New York, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

67. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[5]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said,

---

[5]     Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[6]

c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[7]

d. The New York Daily News obtained and published two (2) internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[8]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[9]

---

[6]    Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at* http://www.nydailynews.com/ny_local/ 2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

[7]    *Id.*

[8]    James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/ 2010-11-08_cops_told_to_meet_quotas.html.

[9]    Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_ m7iRAd9b4E9alYPuGvy5OO.

f.  In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[10]

g.  In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[11]

h.  Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[12] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated Mr. BELL's constitutional rights and contributed to her arrest."[13]

i.  The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violation citations, three "quality-of-life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[14]

---

[10]     Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

[11]     Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

[12]     William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[13]     Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[14]     *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

j.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[15]

68. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly

---

[15]    Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[16]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain.  It's more for convenience."[17]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[18] When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to

---

[16]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[17]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December   2,   2009,   *available   at*   http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[18]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507   (about   5%).   *See*,   CCRB   Jan.-Dec.   2007   Status   Report   at   p.   19,   *available   at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

prosecute 40% of the cases sent to it by the CCRB in 2009.[19] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[20]

69. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, <u>inter alia</u>, by the following:

    a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[21]

> […]

> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of

---

[19]    Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[20]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[21]    Mollen Commission Report, p. 36.

perjury, he asked in disbelief, "What's wrong with that? They're guilty."[22]

b. In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[23]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[24] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

---

[22]   Mollen Commission Report, pp. 40-41.

[23]   Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[24]   Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[25]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[26]

e.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

---

[25]     *Id.*

[26]     John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[27]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[28]

f.   In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[29] falsely arrested and accused a 41-year old grandmother of prostitution, agreeing to pay the woman a $35,000 settlement. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when plaintiff had never been arrested for this offense."[30]

g.   Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[31]

70. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

---

[27]   Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[28]   John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[29]   In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[30]   *Id.*

[31]   David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

    a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

71. The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officials of the NYPD and the CITY, including, without limitation, NYPD Commissioner Kelly.

72. The actions of the officer-defendants resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn criminal court complaints, sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the

malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow officers, supervisors and/or subordinates against those civilians.

73. All of the foregoing acts by defendants deprived Mr. BELL of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraphs "54" through "60" above.

74. Defendant CITY knew or should have known that the acts alleged herein would deprive Mr. BELL of his rights, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

75. Defendant CITY is directly liable and responsible for the acts of the officer-defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

76. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

77. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the officer-defendants felt empowered to arrest Mr. BELL without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Mr. BELL's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, officer-defendants failed to intervene in or report the arresting officer's violation of Mr. BELL's rights and subsequent perjury.

78. Mr. BELL's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

79. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of Mr. BELL's constitutional rights.

### FOURTH CLAIM
### *RESPONDEAT SUPERIOR* LIABILITY OF THE CITY OF NEW YORK
### FOR VIOLATIONS OF THE LAWS OF THE STATE OF NEW YORK

80. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

81. The conduct of the officer-defendants alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as NYPD officers, and/or while they were acting as agents and employees of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable

to Mr. BELL for the officer-defendants' common law torts pursuant to the common law doctrine of *respondeat superior*.

82. As a result of the foregoing, Mr. BELL was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**FIFTH CLAIM**
**VIOLATIONS OF THE CONSTITUTION OF THE STATE OF NEW YORK**

83. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

84. Defendants' conduct alleged herein breached the protections guaranteed to Mr. BELL by the New York State Constitution, including the following rights: (a) freedom from retaliatory arrest, under the Article I, Section 8; (b) freedom from retaliatory prosecution, under Article I, Section 8; (c) freedom from unreasonable seizure of his person, under Article I, Section 12; (d) freedom from false arrest and false imprisonment, under Article I, Section 12; (e) freedom from malicious prosecution, under Article I, Section 12; (f) freedom from having *Miranda*-defective statements used against him in a criminal court proceeding, under Article I, Section 6; (g) freedom from the lodging of false charges against him by police officers, under Article I, Section 6; (h) freedom from having police officers fabricate evidence against him, under Article I, Section 12; and (i) freedom from abuse of process, under Article I, Section 12.

85. Defendants' deprivation of Mr. BELL's rights under the New York State Constitution resulted in the injuries and damages set forth above.

## SIXTH CLAIM
## ASSAULT AND BATTERY
## UNDER THE LAWS OF THE STATE OF NEW YORK

86. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

87. By the actions described above, defendants did inflict assault and battery upon Mr. BELL. The acts and conduct of defendants were the direct and proximate cause of injury and damage to Mr. BELL and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

88. As a result of the foregoing, Mr. BELL was deprived of his liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CLAIM
## FALSE ARREST AND FALSE IMPRISONMENT
## UNDER THE LAWS OF THE STATE OF NEW YORK

89. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

90. By the actions described above, defendants falsely arrested Mr. BELL, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so. The defendants' deliberate acts were the direct and proximate cause of injury and damage to Mr. BELL and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

91. As a result of the foregoing, Mr. BELL was deprived of his liberty, suffered serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**EIGHTH CLAIM**
**ABUSE OF PROCESS**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

92. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

93. By the conduct and actions described above, defendants employed regularly issued process against Mr. BELL compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm Mr. BELL without economic or social excuse or justification, and the defendants were seeking a collateral advantage (namely, the attainment of their productivity goals or arrest quotas) or corresponding detriment to Mr. BELL (namely, retaliation for his protected speech), which was outside the legitimate ends of the process.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. BELL and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

94. As a result of the foregoing, Mr. BELL was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**NINTH CLAIM**
**INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

95. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

96. By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Mr. BELL.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage

to Mr. BELL and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

97. As a result of the foregoing, Mr. BELL was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

**TENTH CLAIM**
**NEGLIGENCE**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

98. Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

99. The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to Mr. BELL.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. BELL and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

100.   As a result of the foregoing, Mr. BELL was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**ELEVENTH CLAIM**
**NEGLIGENT HIRING, SCREENING, RETENTION,**
**SUPERVISION, AND TRAINING**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

101.   Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

102.   Defendant CITY negligently hired, screened, retained, supervised, and trained defendants. The acts and conduct of the defendants were the direct and proximate cause of

injury and damage to Mr. BELL and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

103.   As a result of the foregoing, Mr. BELL was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**TWELFTH CLAIM**
**MALICIOUS PROSECUTION**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

104.   Mr. BELL incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

105.   By the actions described above, particularly by the false allegations against Mr. BELL in the accusatory instrument, defendant P.O. PLAY caused a criminal proceeding to be initiated against Mr. BELL, even though there was no probable cause for an arrest or prosecution in this matter. P.O. PLAY maliciously caused this prosecution to be initiated in that he knew there was no probable cause for such prosecution and that he further wished to harm and punish Mr. BELL for illegitimate reasons. The criminal case against Mr. BELL was terminated in his favor in that all charges were dismissed in their entirety.

106.   As a result of the foregoing, Mr. BELL was deprived of his liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

**JURY DEMAND**

107.   Mr. BELL demands a trial by jury in this action on each and every one of his damage claims.

**WHEREFORE** Mr. BELL demands judgment against the defendants individually and jointly and prays for relief as follows:

a.   That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish and humiliation; and

b.   That he be awarded punitive damages against the individual defendants; and

c.   That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.   That the Court issue an Order declaring the officer-defendants' conduct herein to be in violation of Mr. BELL's rights under the First, Fourth, Fifth and Fourteenth Amendments to the federal constitution; and

e.   For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         July 10, 2012

Respectfully submitted,

/s/

By:   _____
      Robert M. Quackenbush
      Rankin & Taylor, PLLC
      *Attorneys for the Plaintiff*
      350 Broadway, Suite 701
      New York, New York 10013
      t: 212-226-4507